No. 26,366.

THE STANDARD CHAUTAUQUA SYSTEM, *Appellant,* v. ANNA GIFT
et al., *Appellees.*

SYLLABUS BY THE COURT.

1. ASSIGNMENTS—*Contracts Involving Relations of Personal Confidence.* A
contract by parties with certain citizens of a community to select and
furnish lecturers, musicians and other entertainers for a Chautauqua as-
sembly and for the supervision and conduct of an assembly for certain
considerations, involved so much of personal credit and relations of con-
fidence to which liabilities were attached, as not to be assignable.

2. SAME—The insertion in the contract that it shall bind the parties thereto
"their successors and assigns," coupled with a provision that the contract
shall not be changed or modified except by written mutual consent, does
not authorize the assignment of the rights under the contract to another.

Appeal from Jewell district court; WILLIAM R. MITCHELL, judge. Opinion
filed January 9, 1926. Affirmed.

*R. L. Hamilton,* of Beloit, for the appellant.

*R. W. Turner, Donald Stanley* and *R. B. Turner,* all of Mankato, for the
appellees; *R. C. Postlethwaite* and *L. E. Weltmer,* both of Mankato, of
counsel.

The opinion of the court was delivered by

JOHNSTON, C. J.:    This appeal involves the binding force of an
assigned contract to conduct a five-day Chautauqua assembly at
Mankato in the summer of 1924. According to the averments of the
petition, the contract was made between the Midland Chautauqua,
through its managers, Robert L. Myers and Nelson Trimble, and
certain citizens of Mankato, who were named as defendants, by
which it was stipulated that the Midland Chautauqua, designated
as the bureau, should furnish talent for the program, including
Midland quality lecturers, entertainers, musicians and musical or-
ganizations; also that it should furnish a large auditorium tent,
advance organization, trained junior leader for children, full light-
ing equipment, single and season tickets, platform superintendent,
display advertising, handsome art programs, trained advance or-
ganizers, newspaper plate matter, and helper if needed. The de-
fendants, designated as the committee, agreed to furnish grounds,
license if required, pay all local expenses, namely: to seat, light

Assignments, 5 C. J. pp. 875 n. 97, 882 n. 34; L. R. A. 1917F 842; 2 R. C. L.
602.

platform and tent, furnish material for tent poles and fence poles, piano, do the hauling of equipment, distribute advertising material, furnish five men to help erect and take down the tent, and also to pay for newspaper advertising. The committee agreed to pay the bureau for all the above services, talent and subscriptions to "Ideals," the sum of $750, by noon of the opening day of the Chautauqua, and to give the bureau their hearty support and coöperation to make the Chautauqua a success. It was further agreed that the bureau should have the first $50 of the single admissions, and all other receipts from the assembly, except that the committee should retain the proceeds from season tickets, sold by them up to $800; one-half of all proceeds from season tickets sold by them in excess of $800; one-half of all single admissions after the first $50, and all receipts from concession or refreshment stand privileges. There was a further agreement that if any of the talent as advertised failed to appear on account of sickness, death or causes beyond the control of the bureau, it would furnish talent of equal or greater merit if possible. Then followed the provision:

"All agreements and promises of bureau, agent and committee, are indicated herein. This agreement includes no oral promises, and it cannot be changed, modified or canceled except by written mutual consent and when signed by fifteen persons and accepted and signed by party of the first part is valid and shall bind and benefit the parties thereto, their successors or assigns."

In the petition it was alleged that on March 28, 1924, the Midland Chautauqua for a valuable consideration, assigned the contract to the Standard Chautauqua System, and notified the defendants that they had arranged with that system to furnish the Mankato Chautauqua for 1924; that the assignee, which is the plaintiff herein, assumed responsibility for the furnishing of the Mankato Chautauqua and made necessary arrangements for putting on the same on April 21, 1924, and notified some of the defendants of the change and the dates for the proposed Chautauqua.

The plaintiff also suggested to defendants that it would present two plays, "Friendly Enemies," and "The Gorilla," the Loveless Concert Company, St. Cecelia Singing Orchestra, and a novelty trio, and three splendid lecturers that were named. The plaintiff alleged that the proposed program was one of the same or better quality than that of the Midland Chautauqua, and the talent to be furnished was high class in every respect. It was further alleged that the plaintiff came on and furnished everything that was re-

quired by the contract on August 21, 1924, but that the defendants and each of them refused and neglected to assist in any way whatever and neglected to carry out their part of the agreement in any particular. They therefore asked for damages in the sum of $950.

A demurrer to the petition was sustained by the trial court on the ground that a cause of action had not been stated. The principal contention of the defendants is that the contract was so personal in character that it was nonassignable, and that under the provisions contained in the contract a change or modification of it could not be made without the written consent of the defendant.

There was no error in the ruling. The bureau operated by Myers and Trimble contracted to act as agents of defendant in selecting lecturers and entertainers for a Chautauqua assembly. Because of their belief in the wisdom and experience of the managers of the bureau or of the reputation of the bureau, or of both, defendants intrusted to them the selection of entertainers, instructors and managers, including lecturers, musicians, trained leaders of children and a platform superintendent. It was somewhat in the nature of an agency contract, and one involving a relationship of personal credit and confidence. Relying on the skill, discretion and integrity of the managers of the bureau, defendants were willing to allow it to choose the talent, believing that they could do so and conduct an educational, entertaining and successful assembly. The contract therefor involved personal and confidential relations to which liabilities were attached. While rights under ordinary contracts are assignable, there are well recognized exceptions, and it is generally held that rights arising out of contracts involving a relationship of personal credit and confidence are not assignable by one party unless the other consents to the transfer. In *Campbell v. Sumner County,* 64 Kan. 376, 67 Pac. 866, the assignability of a contract for printing was under consideration, and it was held that it must be assumed the printer was chosen because of qualifications in printing and of artistic skill, and being of such a personal nature the contract was not assignable. Reference was made in the opinion to *Arkansas Smelting Co. v. Belden Co.,* 127 U. S. 379, in which the rule was stated that:

"Rights arising out of contracts cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided." (p. 388.)

The same rule was adopted in a case where a contract was made with a firm of architects to make plans and specifications for a building and perform the services that were incident to the employment, and it was held that the rule applied to all contracts involving special skill or personal confidence. (*Smith & English, Partners, v. Board of Education,* 115 Kan. 155, 222 Pac. 101.) See, also, 10 A. L. R. and note, 649; 5 C. J. 880; L. R. A. 1916F 89; L. R. A. 1918A 292.

It is argued that the word "assigns" used in the quoted paragraph of the contract imports an intention to make it assignable. The interpretation of the contract, however, requires a consideration of all its provisions, and when all are read together they do not carry the idea that the parties intended that either might transfer their duties, rights and responsibilities without the consent of the other. Aside from the personal credit and confidence involved, there was the stipulation that the contract could not be changed except by the written mutual consent of the parties. The recitation that the contract should be binding upon the parties, their successors and assigns, does not take the personal element out of it nor overcome the provisions indicating that it is not transferable without mutual consent. In an action involving a relation of personal confidence and personal performance, where a party bound himself, his heirs and assigns, it was held that the clause did not make the contract assignable. It was said:

"The fact that Freeman agreed for himself, his heirs and assigns, does not make the contract assignable so as to bind Gaffinel. Its object was to bind Freeman's heirs to liability in case of breach, and so far as concerns assigns is applicable only to the extent to which the contract might legally be assignable by Freeman; for example, an assignment by him of the money due for staves that might be actually sold and delivered. To hold that these words made the contract assignable in the wider sense would necessitate the conclusion that it might be performed by his heirs-at-law." (*Schlessinger v. Forest Products Co.,* 78 N. J. L. 637. See, also, *Wooster v. Crane & Co.,* 73 N. J. Eq. 22.)

The trial court ruled correctly in sustaining the demurrer to plaintiff's petition and its judgment is therefore affirmed.