(163 P.3d 1247)
No. 97,018

NORTH COUNTRY VILLAS HOMEOWNERS ASSOCIATION, *et al.*, *Appellees*, v. RANDY J. KOKENGE, LORI A. KOKENGE, CLAMPITT-HERSH DEVELOPMENT, LLC, NATIONS DEVELOPMENT CORPORATION, and CHARLES NATIONS, *Appellants*.

Opinion filed August 3, 2007.

*Vernon L. Jarboe* and *Martha A. Peterson*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, for appellants.

*Randall J. Forbes* and *Terry A. Iles*, of Frieden & Forbes, of Topeka, for appellees.

Before MALONE, P.J., BUSER and LEBEN, JJ.

MALONE, J.: Nations Development Corporation (NDC) was the original developer of the North Country Villas subdivision, which consisted of single family homes and duplexes. In June and November 2005, NDC sold lots to Randy J. Kokenge and Lori A. Kokenge (the Kokenges) and Clampitt-Hersh Development, LLC (Clampitt-Hersh). In November 2005, NDC assigned its rights as declarant to the Kokenges and Clampitt-Hersh. As declarants, the Kokenges and Clampitt-Hersh revoked the Declaration of Covenants, Restrictions, and Easements for the subdivision as to the land owned by them. The Kokenges then began building a four-plex on the subdivision.

The other homeowners held a meeting and elected officers and a board of directors of North Country Villas Homeowners Association (North Country). North Country and the individual homeowners then filed a petition with the district court. The petition asked the district court to declare that the Kokenges and Clampitt-Hersh were subject to the Declaration's restrictions and to enjoin the Kokenges from building the four-plex. The parties filed stipulated facts, and the district court granted summary judgment in favor of North County and homeowners.

NDC, the Kokenges, and Clampitt-Hersh raise three issues on appeal: (1) The district court erred in finding that NDC could not assign its rights under the Declaration; (2) the district court erred in finding that the Kokenges and Clampitt-Hersh could not revoke or amend the Declaration as to properties owned by them; and (3) the district court erred in determining that North Country's officers and directors were properly elected.

We conclude the district court did not err in finding that the attempt by the Kokenges and Clampitt-Hersh to either revoke or amend the Declaration as to their property was unenforceable. In doing so, we adopt Restatement (Third) of Property: Servitudes §

6.21 (1998), which provides that a developer may not exercise a power to amend or modify the declaration in a way that would materially change the character of the development or the burdens on the existing community members unless the declaration fairly apprises purchasers that the power could be used for the kind of change proposed. Here, the general amendment provision of the Declaration did not sufficiently notify purchasers that the developer could make such a drastic amendment that would materially change the character of the development. Accordingly, we affirm the decision of the district court.

## Factual and procedural background

In 1999 and 2000, Charles Nations, as president of NDC, recorded final plats for the Urban Hills Subdivision 14 and 15 with the Shawnee County Register of Deeds office. Urban Hills Subdivision 14 and 15 is a residential subdivision located north of Topeka, Kansas. The subdivision is commonly referred to as the North Country Villas (subdivision).

In February 2001, NDC filed the Declaration of Covenants, Restrictions, and Dedication of Easements of North Country Villas (Declaration) with the Shawnee County Register of Deeds office. The Declaration identified the declarant as NDC, its successors, heirs, and assigns. The Declaration imposed property use restrictions on owners of lots in the subdivision. In particular, the Declaration essentially defined "Villa Unit" to mean either a single family home or a duplex.

In April 2001, not-for-profit articles of incorporation were filed with the Kansas Secretary of State's office, creating North Country. The Declaration provided that North Country had two classes of voting membership: (1) Class A memberships were issued to all lot owners except the declarant and (2) Class B memberships were issued to the declarant. Under the Declaration, "[t]he number of Class B memberships shall, at all times, equal the number of Class A memberships multiplied by four."

From 2001 through 2005, NDC advertised the subdivision and sold lots. In June 2005, NDC sold a lot located in the subdivision to the Kokenges. On November 10, 2005, NDC sold lots to Clamp-

itt-Hersh. On November 14, 2005, NDC sold more lots to the Kokenges.

On November 10, 2005, NDC filed an assignment of developer's rights with the Shawnee Country Register of Deeds office. In the document, NDC assigned "all of its interest as Declarant and all of its interest as a Class B membership owner in the Urban Hills Subdivisions" to the Kokenges and Clampitt-Hersh. Clampitt-Hersh then filed a document revoking the Declaration as to the lands owned by it with the Shawnee County Register of Deeds office. The Kokenges filed a similar document revoking the Declaration as to the lands owned by them.

On November 18, 2005, Clampitt-Hersh sent a letter to the subdivision's lot owners informing them that NDC had sold its "remaining land interest to the consortium of A Construction & Consulting, LLC and Clampitt-Hersh Development, LLC." The letter stated that as of December 1, 2005, it would manage the homeowners association. On November 28, 2005, Randy Kokenge filed a building permit application, requesting a permit to build a four-plex in the subdivision. The Shawnee County Planning Department issued a building permit for the construction of a six-bedroom four-plex. The Kokenges then began building a four-plex in the subdivision.

On December 28, 2005, Barbara Hersh, Gayle Clampitt, and Randy Kokenge sent a letter to the subdivision's homeowners in which they informed the owners that they were transferring management of North Country over to the owners. The letter stated, in part:

"Because of the extensive phone calls and demands, we have decided to immediately transfer the management to you, the homeowners. You will need to elect officers, and open a checking account in the name of the association. At that time we will release the remaining funds which we have received since December 1, 2005. **This needs to be done immediately**, and we will no longer accept dues, and will not manage the association, as a courtesy or otherwise."

The letter further stated that "[a]s Declarants, the properties we purchased are exempt from the North Country Villas Homeowners Association and their restrictions and we have elected to not become members at this time."

On February 1, 2006, the homeowners held a meeting and elected officers and a board of directors for North Country. On February 8, 2006, North Country and individual homeowners filed a petition with the Shawnee County District Court. The petition named the Kokenges, Clampitt-Hersh, NDC, and Nations as defendants. The petition asked the district court to find that NDC's assignment of its rights as declarant to the Kokenges and Clampitt-Hersh was invalid. The petition also asked the district court to declare that the Kokenges and Clampitt-Hersh were subject to the Declaration's restrictions. Finally, the petition asked the district court to enjoin the Kokenges from constructing the four-plex and to require them to remove the portion that had already been constructed. In April 2006, the parties jointly filed stipulated facts. Both parties then filed motions for summary judgment.

On May 16, 2006, the district court entered a memorandum decision and order granting North Country's motion for summary judgment. The district court entered an injunction against the Kokenges and Clampitt-Hersh, requiring them to abide by the terms of the Declaration and enjoining them from building any structure in the subdivision that did not fall under the Declaration's definition of "Villa Unit." In its order, the district court found that the Kokenges and Clampitt-Hersh did not have the authority to "revoke" the Declaration as to the properties they owned. On July 21, 2006, the district court filed a subsequent memorandum decision and order. In its July 2006 order, the district court found that NDC's assignment of its rights as declarant to the Kokenges and Clampitt-Hersh was invalid and that North Country's officers and directors had been properly elected at the February 1, 2006, homeowners' meeting. NDC, the Kokenges, and Clampitt-Hersh timely appeal the district court's rulings.

### Standard of review

Appellate review of the district court's order granting summary judgment is well known:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, [appellate courts] apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

Where there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Roy v. Young*, 278 Kan. 244, 247, 93 P.3d 712 (2004). Here, the district court's decision was based on stipulated facts. As such, this court's review of the district court's rulings is de novo.

### Could NDC assign its rights under the Declaration?

NDC, the Kokenges, and Clampitt-Hersh first claim the district court erred in determining that NDC could not assign its rights as the declarant to the Kokenges and Clampitt-Hersh. They contend the Declaration specifically contemplated that NDC could assign its rights to other parties. North Country argues that NDC could not assign its rights under the Declaration because its rights were personal in nature and the Declaration did not expressly permit the assignment of such rights.

Article One of the Declaration defined "Declarant" as NDC, its successors, heirs, and assigns. Article Eleven of the Declaration provided that North Country had two classes of voting membership. Class A memberships were issued to all lot owners except the declarant and Class B memberships were issued to the declarant. NDC, as the declarant, purported to assign all of its interests as a Class B member and as declarant to the Kokenges and Clampitt-Hersh in a November 2005 document titled Assignment of Developer's Rights.

The district court found that NDC could not assign its Class B membership rights to the Kokenges and Clampitt-Hersh:

"Rather, the Court finds that the words 'successors, heirs and assigns' are simply used in the Declaration to make it clear that the 'covenants, conditions and re-

strictions' are to 'run with and bind the real estate' regardless of who may own the real property in the future. . . . Thus, the Court finds that [NDC] did not have the authority to assign its Class B rights to [the Kokenges and Clampitt-Hersh] and that any Class B rights which may still be in existence are retained by [NDC], to be exercised through and by its representative, Charles Nations."

To resolve this issue this court must interpret North Country's Declaration. The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. *McGinley v. Bank of America, N.A.*, 279 Kan. 426, 431, 109 P.3d 1146 (2005). This court uses the same rules it applies to interpret contracts to interpret the Declaration. See *South Shore Homes Ass'n v. Holland Holiday's*, 219 Kan. 744, 751, 549 P.2d 1035 (1976); *Sporn v. Overholt*, 175 Kan. 197, 199, 262 P.2d 828 (1953).

Generally, contract rights are assignable in Kansas. *Alldritt v. Kansas Centennial Global Exposition*, 189 Kan. 649, 657, 371 P.2d 181 (1962). However, there is a well-recognized exception to this general rule which prohibits the assignment of rights arising out of contracts involving "personal and confidential relations to which liabilities are attached." *Safelite Glass Corp. v. Fuller*, 15 Kan. App. 2d 351, 358, 807 P.2d 677, *rev. denied* 249 Kan. 776 (1991); see *Alldritt*, 189 Kan. at 657; *Standard Chautauqua System v. Gift*, 120 Kan. 101, 103, 242 Pac. 145 (1926).

Here, the Declaration did not expressly prohibit the assignment of any of the declarant's rights. In fact, the Declaration implicitly recognized that the declarant could assign its rights under the Declaration by defining declarant as NDC and "its successors, heirs and assigns." Because the Declaration did not expressly prohibit assignment and contract rights are generally assignable, the issue is whether NDC was prohibited from assigning its rights because the rights involved were personal.

There are no Kansas cases that specifically address whether the declarant's rights under a homeowners association declaration are personal and, thus, unassignable. As mentioned earlier, in Kansas, contract rights are freely assignable unless the rights involve "personal and confidential relations to which liabilities are attached." *Safelite Glass Corp.*, 15 Kan. App. 2d at 358. The Kansas Supreme

Court has found that a contract to entertain and provide speaker services involved personal services, making the rights under the contract unassignable. *Standard Chautauqua System*, 120 Kan. at 103-04. The Kansas Supreme Court has also found that a contract for architectural services was unassignable because it was personal in nature. *Smith & English, Partners v. Board of Education*, 115 Kan. 155, 156-58, 222 Pac. 101 (1924). For further examples of unassignable contracts involving personal services, see 6 Am. Jur. 2d, Assignments § 30.

Here, NDC, as the original declarant, was responsible for developing the North Country subdivision pursuant to the restrictions and intent of the Declaration. In particular, the declarant was required to abide by the terms of the Declaration in order "to protect the value, desirability and attractiveness of the property." There was no evidence before the district court to suggest that the Kokenges and Clampitt-Hersh could not perform this function as well as NDC. There was nothing unique about NDC's obligations under the Declaration. Thus, it does not appear that the Declaration included rights involving personal and confidential relations to which liabilities were attached. Because the rights under the Declaration were not personal, NDC could freely assign its rights as the declarant and Class B member to other parties. Thus, we conclude the district court erred in finding that NDC could not assign its rights under the Declaration to the Kokenges and Clampitt-Hersh.

### Was the revocation or amendment enforceable?

Next, NBC, the Kokenges, and Clampitt-Hersh claim the district court erred in finding that the Kokenges and Clampitt-Hersh could not revoke or amend the Declaration as to the properties owned by them. North Country argues that the district court properly concluded that the Kokenges and Clampitt-Hersh could not revoke or amend the Declaration to permit the building of a four-plex.

As previously indicated, NDC assigned its rights as declarant and Class B owner to the Kokenges and Clampitt-Hersh. The Declaration provided that "Class B owners may amend at any time as to the lands owned by Declarant." After being assigned these rights, the Kokenges and Clampitt-Hersh filed documents titled "Revo-

cation of Declarations Recorded at Book 3473, Page 284." In these documents, the Kokenges and Clampitt-Hersh claimed to exercise their rights as Class B owners by revoking the Declaration as to the lands owned by them.

The district court framed the issue as whether the Declaration allowed declarants to revoke or amend the Declaration. The district court found that the Declaration did not give the Kokenges and Clampitt-Hersh, as declarants and Class B owners, the right to *revoke* the Declaration. The district court reviewed definitions of "amend," "abolish," and "revoke," concluding that the Declaration only authorized Class B owners to amend the Declaration as to lands owned by them.

Whether the action taken by the Kokenges and Clampitt-Hersh is labeled as a revocation of the Declaration or as an amendment to the Declaration is not the real issue in this case. It is clear that the "Revocations" filed by the Kokenges and Clampitt-Hersh did not revoke the entire Declaration. Instead, it simply exempted the property owned by Class B members from the Declaration. The documents filed by the Kokenges and Clampitt-Hersh were more in the nature of an amendment to the Declaration, and the Declaration clearly provided that Class B owners may amend the Declaration at any time as to the lands owned by the declarant. Thus, the real issue in this case is whether this *particular* amendment to the Declaration was unenforceable.

NDC, the Kokenges, and Clampitt-Hersh contend that a developer should have the right to unilaterally amend a declaration if purchasers had notice that the developer had the right to do so. They further contend that because the Declaration authorized Class B owners to amend the Declaration at any time as to lands owned by the declarant, the amendment should not be subjected to a reasonableness standard. North Country contends that because the Declaration did not specifically inform purchasers of the kind of change attempted by the Kokenges and Clampitt-Hersh, any such amendment is unenforceable.

The district court relied on the Restatement (Third) of Property (1998) to find that the amendment to the Declaration was unen-

forceable. Specifically, the district court relied on the following Restatement:

"A developer may not exercise a power to amend or modify the declaration in a way that would materially change the character of the development or the burdens on the existing community members unless the declaration fairly apprises purchasers that the power could be used for the kind of change proposed." Restatement (Third) of Property: Servitudes § 6.21 (1998).

Whether the district court applied the appropriate test to determine whether the amendment to the Declaration was enforceable is a question of law over which this court has unlimited review. See *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004).

As noted by the district court, adopting the Restatement (Third) of Property: Servitudes § 6.21 is consistent with the legal principle that a court should only enforce a restrictive covenant if the purchaser had notice of the restriction. This legal principle has long been recognized by Kansas courts:

"The enforceability of restrictive covenants has its origin in common law and has long been recognized in the state of Kansas. *McColm v. Stegman*, 3 Kan. App. 2d 416, 419-20, 596 P.2d 167 (1979). Enforceability is based on the equitable [principle] of notice, whereby a person who takes land with notice of a restriction upon it will not be permitted to act in violation of that restriction. *Hecht v. Stephens*, 204 Kan. 559, 561-62, 464 P.2d 258 (1970). Persons who take real property with notice of restrictive covenants will not be permitted to act in violation thereof, and may be enjoined in equity. *Kennedy v. Classic Designs, Inc.*, 239 Kan. 540, Syl. ¶ 2, 722 P.2d 504 (1986)." *Persimmon Hill First Homes Ass'n v. Lonsdale*, 31 Kan. App. 2d 889, 892, 75 P.3d 278 (2003).

Contrary to the argument made by NDC, the Kokenges, and Clampitt-Hersh, the district court did not apply a reasonableness test to determine whether the amendment of the Declaration was enforceable. Instead, the district court found that allowing the amendment would violate notice principles by materially changing the general development plan of the subdivision without fair warning to purchasers. A declaration provision that grants the declarant a general power to amend does not truly alert purchasers of lots in the subdivision of the risks involved in their purchase.

"The character of a common-interest community as indicated by the existing housing and promotional materials is frequently one of the most important considerations for prospective purchasers. People generally believe that a developer

will continue to build housing of a similar quality and character, and anticipate that the value of the property they buy will not be undercut by future construction in the project. . . .

" . . . [D]evelopers may retain powers within a particular phase, or within an entire project, to waive or amend the servitudes. *If this provision is couched in general terms, it is unlikely to alert purchasers to the true risks involved in their purchase. To protect their legitimate expectations, developers are prevented from exercising such powers to make material changes in the character of the development or the burdens on existing owners unless the declaration clearly gives notice that it can be exercised with that effect.*" (Emphasis added.) Restatement (Third) of Property: Servitudes § 6.21, comment a.

Here, Article Nine, Paragraph 2, of the Declaration provided that "[u]ntil such time as the first villa unit is sold . . ., Declarant, at its sole discretion, may abolish said covenants, conditions and restrictions or change them in whole or in part." NDC was the original developer of North Country and until such time that any of the lots were sold to purchasers, NDC retained the right to abolish the covenants and restrictions because such action would not affect the rights of other property owners. The Declaration provided adequate notice of this right.

However, once North Country lots were sold to subsequent purchasers, the Declaration also provided that "Class B owners may amend at any time as to the lands owned by Declarant." This provision is extremely broad and does not place any restrictions on the extent the developer can amend the Declaration after lots have been sold. Such an amendment provision is too broad to be enforceable. Under the Restatement, courts should only enforce a declaration amendment if the declaration clearly informed purchasers of the specific changes that could be made to the subdivision's character and general plan through such an amendment. See Restatement (Third) of Property: Servitudes § 6.21, illustration 2.

We adopt the Restatement (Third) of Property: Servitudes § 6.21 to determine the enforceability of the Declaration amendment at issue. A developer may not exercise a power to amend or modify the declaration in a way that would materially change the character of the development or the burdens on the existing community members unless the declaration fairly apprises purchasers

that the power could be used for the kind of change proposed. Here, the Declaration provided the declarant with a general power to amend the Declaration as to property owned by the declarant. The Kokenges and Clampitt-Hersh took the drastic step of amending the Declaration so that their property would not be subject to *any* of the Declaration's restrictive covenants, allowing them to materially change the character of the development. In fact, the Kokenges attempted to construct a four-plex after the amendment. Building a four-plex in a development created for single family homes and duplexes would materially change the character of the development. Because the general power to amend the Declaration did not fairly apprise the purchasers of the drastic change attempted by the Kokenges and Clampitt-Hersh, we agree with the district court that the amendment was unenforceable.

### *Were North Country's officers and directors properly elected?*

Finally, NDC, the Kokenges, and Clampitt-Hersh claim North Country's officers and directors were not properly elected because there was not a quorum present at the meeting on February 1, 2006. They also claim that they did not receive proper notice of the meeting. Because of these defects, they contend that all actions by North Country, including the filing of this lawsuit, are void. North Country argues that the Kokenges and Clampitt-Hersh surrendered their voting rights as Class B members and that a quorum of Class A members was present at the election meeting.

The district court found that North Country's officers and directors were duly elected because a quorum was present at the election meeting:

"Although the Defendants voluntarily chose not to attend, Charles Nations and at least 17 other property owners did attend the Association meeting. As such, the Court finds that all of the remaining Class B rights were represented at the Association meeting. Moreover, since the Defendants had voluntarily 'elected to not become members' of the Association, the Court finds that at least 50% of the Class A owners who were 'entitled to vote' were also represented at the meeting. Thus, the Court finds that the Officers and Board of Directors of the North Country Villas Homeowners Association were validly elected on February 1, 2006."

To determine whether the Kokenges and Clampitt-Hersh surrendered their voting rights, this court must interpret the Declaration and other documents, including the December 28, 2005, letter from the assigned declarants to the subdivision's homeowners. The interpretation of written instruments is a question of law over which an appellate court has unlimited review. *McGinley*, 279 Kan. at 431.

As previously indicated, the Declaration provided that the homeowners association had two classes of voting memberships: Class A and Class B. Class A memberships were issued to all owners except the declarant; Class B memberships were issued to the declarant. The Declaration also included a provision for the termination of Class B membership: "All Class B Memberships shall be surrendered by Declarant to the Board of Directors of the Association for cancellation upon the occurrence of either of the following events: (i). All lots have been sold; or (ii). *Declarant voluntarily surrenders his Class B membership*." (Emphasis added.) NDC assigned its rights as declarant to the Kokenges and Clampitt-Hersh. After the assignment, the only voting rights the Kokenges and Clampitt-Hersh had were as Class B members.

In their December 28, 2005, letter to the subdivision's homeowners, the Kokenges and Clampitt-Hersh stated the following: "As Declarants, the properties we purchased are exempt from the North Country Villas Homeowners Association and their restrictions and *we have elected to not become members at this time*." (Emphasis added.) If a person or an entity is not a member of the association, it follows that they could not have any voting rights in the association. It also follows that they were not entitled to receive notice of the homeowners meeting. The Kokenges and Clampitt-Hersh clearly stated in their letter that they were electing not to become members of the homeowners association. It would be illogical to find that the Kokenges and Clampitt-Hersh could choose not to be members of the association but still retain voting rights in the association. We agree with the district court that, at least as far as the February 1, 2006, meeting was concerned, the Kokenges and Clampitt-Hersh voluntarily surrendered their Class B memberships based on the December 28, 2005, letter.

Quorum requirements are addressed in the Declaration: "Fifty (50%) of the outstanding Class A and all of the Class B memberships of the Association entitled to vote represented in person or by proxy shall constitute a quorum at any meeting of the Association." As we have just established, there were no longer any Class B memberships in existence because the Kokenges and Clampitt-Hersh surrendered them. As such, 50% of the outstanding Class A memberships must have been represented at the election meeting to constitute a quorum.

The stipulated facts filed by the parties in district court included an exhibit entitled "North Country Villas Homeowner's Association Membership List," which listed 24 homeowners in the subdivision. The stipulated facts also included as an exhibit the sign-in sheet for the February 1, 2006, meeting. According to the sign-in sheet, at least 17 of the outstanding Class A members were in attendance at the election meeting. This exceeded the 50% quorum requirement of the Declaration. Because a quorum attended the election meeting, we conclude North Country's officers and directors were properly elected.

### Conclusion

In summary, the district court erred in finding that NDC could not assign its rights under the Declaration because the Declaration did not prohibit the assignment and the rights were not personal in nature. Once NDC's rights were assigned to the Kokenges and Clampitt-Hersh, they were generally authorized to amend the Declaration at any time as to their properties. Nevertheless, the district court did not err in finding that *this particular amendment* was unenforceable. Restatement (Third) of Property: Servitudes § 6.21 (1998) states that a developer may not exercise a power to amend or modify the declaration in a way that would materially change the character of the development or the burdens on the existing community members unless the declaration fairly apprises purchasers that the power could be used for the kind of change proposed. We adopt Restatement (Third) of Property: Servitudes § 6.21 as the law of Kansas. Here, the general amendment provision of the Declaration did not sufficiently notify purchasers that a de-

clarant or Class B owner could make such a drastic amendment that would materially change the character of the development. Finally, the district court did not err in finding that North Country's officers and directors were properly elected.

Affirmed in part; reversed in part.